848 F.2d 194
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Lawrence J. SPARKS, Petitioner-Appellant,
v.
Dale FOLTZ, Respondent-Appellee.
 No. 87-1685.
 United States Court of Appeals, Sixth Circuit.
 May 12, 1988.
 
 Before MERRITT and CORNELIA G. KENNEDY, Circuit Judges and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Lawrence J. Sparks appeals from the district court's memorandum opinion and judgment denying his petition for the writ of habeas corpus. For the following reasons, we affirm the district court's judgment.
 
 I.
 
 2
 Petitioner was convicted of first degree murder, Mich.Comp.Laws Sec. 750.316, after a jury trial in Oakland County Circuit Court in 1972. He was sentenced to the mandatory term of life imprisonment. See Id.
 
 
 3
 The prosecution's theory at trial had been that petitioner drove the victim, Wilhelmina (Mimi) Sims, to I-75 in Troy, Michigan and stabbed her to death. Several people who had been with petitioner and Ms. Sims on the night of the murder testified for the prosecution. Petitioner's theory of defense was that he did not commit the crime. Petitioner testified on his own behalf.
 
 
 4
 After his conviction, petitioner filed a direct appeal as of right which addressed the questions of whether the examining magistrate erred in finding that the prosecution had shown probable cause to believe that the crime committed was first degree murder and whether the prosecution's case at preliminary examination had been fatally defective for failure to establish venue. The Michigan Court of Appeals affirmed petitioner's conviction. People v. Sparks, 53 Mich.App. 452, 220 N.W.2d 153 (1974). The Michigan Supreme Court denied leave to appeal this decision. People v. Sparks, 393 Mich. 135, 224 N.W.2d 481 (1974).
 
 
 5
 On July 1, 1985, the Oakland County Circuit Court granted petitioner's application to file a delayed motion for a new trial but denied the motion for a new trial. Subsequently, on October 24, 1985, the Michigan Court of Appeals denied petitioner's motion for peremptory reversal and ordered that petitioner's application for late appeal be denied for lack of merit on the grounds presented. The Michigan Supreme Court denied leave to appeal on March 24, 1986, Justice Archer dissenting.
 
 
 6
 Petitioner filed the instant habeas corpus petition pursuant to 28 U.S.C. Sec. 2254 on April 16, 1986. The district court denied the petition on June 30, 1987. Thereafter, on July 14, 1987, petitioner filed a request for certificate of probable cause and a notice of appeal to this court. The request for certificate of probable cause was denied by the district court but granted by this court on October 19, 1987.
 
 
 7
 This court must address the following four questions on appeal: (1) Whether petitioner was denied due process by certain alleged prosecutorial misconduct; (2) Whether petitioner was denied effective assistance of counsel; (3) Whether petitioner was denied due process by the use of an uncounselled misdemeanor conviction to impeach his credibility; and (4) Whether the trial court's instruction on petitioner's credibility denied him due process by setting a different standard which required a preliminary determination of reliability. We will discuss each of these questions in turn after a brief summary of our standard of review.
 
 II.
 
 8
 "A state prisoner is entitled to relief under 28 U.S.C. Sec. 2254 only if he is held 'in custody in violation of the Constitution or laws or treaties of the United States.' " Engle v. Isaac, 456 U.S. 107, 119 (1982). "Errors of application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus actions." Matlock v. Rose, 731 F.2d 1236, 1242 (6th Cir.1984), cert. denied, 470 U.S. 1050 (1985). Erroneous evidentiary rulings which result in the denial of fundamental fairness, however, will support habeas relief. Walker v. Engle, 703 F.2d 959, 962 (6th Cir.), cert. denied, 464 U.S. 951, cert. denied, 464 U.S. 962 (1983). Furthermore, the state court's findings of fact are entitled to a presumption of correctness under section 2254(d). Martin v. Foltz, 773 F.2d 711, 716 (6th Cir.1985), cert. denied, 106 S.Ct. 3336 (1986). "Such findings are binding on federal courts, however, only if fairly supported by the record as a whole." Bennett v. Scroggy, 793 F.2d 772, 775 (6th Cir.1986). With these basic principles in mind, we turn to a discussion of the issues at hand.
 
 A.
 
 9
 Initially, petitioner argues that he was denied due process and a fair trial by the following prosecutorial misconduct: (1) argument to the jury that petitioner's presence at trial had given him the opportunity to fabricate his testimony to make it conform to the testimony of the witnesses he heard; (2) an attempt to portray petitioner as a bad man; (3) argument which shifted the burden of proof to petitioner; (4) argument which interjected the issue of race into the trial; and (5) the introduction of photographs to inflame the passions of the jury. Respondent maintains that petitioner's claim of prosecutorial misconduct should be barred from habeas consideration on grounds of procedural default. We will consider the question of procedural default first.
 
 
 10
 When a respondent maintains that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, this court must undertake a complex analysis. Maupin v. Smith, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." Id. Failure to abide by a state's contemporaneous objection rule will bar habeas relief under certain circumstances. McBee v. Grant, 763 F.2d 811, 813 (6th Cir.1985). Michigan cases have held that "[a]s a general proposition of law a conviction will not be reversed if by failing to object the defendant has allowed the impact of the prosecutor's remarks to go uncorrected by an instruction." People v. Tarpley, 41 Mich.App. 227, 199 N.W.2d 839, 842 (1972). In the instant case, however, petitioner contemporaneously objected to only one question relevant to the alleged acts of prosecutorial misconduct now before this court.[1]
 
 
 11
 Second, this court must determine whether the state courts actually enforced the state procedural sanction. Maupin, 785 F.2d at 138. C.f. McBee, 763 F.2d at 813 (stating that the cause and prejudice standard is not applied when the state court overlooks the procedural default and instead disposes of the issue on the merits). The entire order of the Michigan Court of Appeals reads as follows:
 
 
 12
 In this cause an application for late appeal and motion for peremptory reversal are filed by defendant-appellant, and an answer in opposition thereto having been filed, and due consideration thereof having been had by the Court,
 
 
 13
 IT IS ORDERED that the motion for peremptory reversal be, and the same is hereby DENIED for failure to persuade the Court of the existence of manifestly reversible error warranting peremptory relief; and,
 
 
 14
 IT IS FURTHER ORDERED that the application for late appeal be, and the same is hereby DENIED for lack of merit in the grounds presented.
 
 
 15
 This order is similar to an order which this court recently indicated was unclear in Cook v. Foltz, 814 F.2d 1109, 1112 (6th Cir.), cert. denied, 108 S.Ct. 119 (1987). If the basis for the state court's decision is unclear, this court must look to the arguments presented to the state court. Raper v. Mintzes, 706 F.2d 161, 164 (6th Cir.1983). This court has applied the following rules, taken from the Second Circuit's opinion in Martinez v. Harris, 675 F.2d 51, 54-55 (2d Cir.), cert. denied, 459 U.S. 849 (1982), to ascertain the basis of the state court's decision:
 
 
 16
 (1) if the state prosecutor only argued the merits of the petitioner's claim before the state court and failed to raise the procedural default issue the federal court may assume that the state court ruled only on the merits; (2) if the prosecutor relied solely on the procedural default the federal court may assume that that was the only basis for the state court's decision; and (3) if the prosecutor argued in the alternative the federal court may assume that the state court did not rely solely on the merits unless it says so.
 
 
 17
 Raper, 706 F.2d at 164.
 
 
 18
 In the instant case, the state prosecutor only argued the merits of petitioner's claims that the prosecutor attempted to portray petitioner as a bad man; that the prosecutor's argument shifted the burden of proof to petitioner; that prosecutor's argument interjected the issue of race into the trial; and that the prosecutor introduced photographs to inflame the passions of the jury. Therefore, this court may assume that the state court ruled only on the merits of these claims. With respect to petitioner's claim that the prosecutor's argument to the jury that petitioner's presence at trial had given him the opportunity to fabricate his testimony to make it conform to the testimony of the witnesses he heard, the prosecutor argued procedural default and the merits in the alternative. Therefore, this court may assume that the state court did not rely solely on the merits of this claim.
 
 
 19
 For these reasons, this court may continue the Maupin analysis with respect to petitioner's claim that the prosecutor's argument to the jury that petitioner's presence at trial had given him the opportunity to fabricate his testimony to make it conform to the testimony of the witnesses he heard. We will consider the merits of petitioner's four other allegations of prosecutorial misconduct without further Maupin analysis.
 
 
 20
 The third step in the Maupin analysis requires this court to determine whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Maupin, 785 F.2d at 138. In the instant case, petitioner does not argue that it is not.
 
 
 21
 Fourth, the petitioner must demonstrate that there was cause for him to not follow the state procedural rule and that he was actually prejudiced by the alleged constitutional error. Id. In the instant case, petitioner argues that ineffective assistance of counsel is the cause of his procedural default.
 
 
 22
 In Murray v. Carrier, 477 U.S. 478 (1986), the Supreme Court considered whether and under what circumstances ineffective assistance of counsel may constitute cause for procedural default. The Court held as follows:
 
 
 23
 Ineffective assistance of counsel ... is cause for a procedural default. However, we think that the exhaustion doctrine, which is 'principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings,' ... generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for procedural default.
 
 
 24
 Carrier, 477 U.S. at 488-89 (citation omitted). In the instant case, as will be discussed further below, petitioner's attorney's failure to contemporaneously object to the argument to the jury that petitioner's presence at trial had given him the opportunity to fabricate his testimony to make it conform to the testimony of the witnesses he heard did not constitute ineffective assistance of counsel.
 
 
 25
 Finally, in addition to the four-step Maupin analysis we must consider that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas corpus court may grant the writ even in the absence of a showing of cause for the procedural default." Id. at 496. In Ewing v. McMackin, 799 F.2d 1143 (6th Cir.1986), we noted that
 
 
 26
 [o]ur task in this respect is to distinguish 'actual' from 'legal' innocence, and determine whether 'refusal to consider the defaulted claim on federal habeas carries with it the risk of a manifest miscarriage of justice.' Relief is not warranted where 'the alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones.' A petitioner fails to persuade a federal court to look past the cause and prejudice test '[w]hen the alleged error is unrelated to innocence, and when the defendant was represented by competent counsel, had a full and fair opportunity to press his claim in the state system, and yet failed to do so in violation of a legitimate rule of procedure.'
 
 
 27
 Ewing, 799 F.2d at 1152 (quoting Smith v. Murray, 477 U.S. 527, 538-39 (1984)). There is no indication that this is an extraordinary case in which a constitutional violation has probably resulted in the conviction of one who is actually innocent. Therefore, this exception does not apply.
 
 
 28
 We hold that the allegation that the prosecutor's argument to the jury that petitioner's presence at trial had given him the opportunity to fabricate his testimony to make it conform to the testimony of the witnesses he heard constituted prosecutorial misconduct is barred by procedural default.
 
 
 29
 We will now consider the merits of petitioner's four remaining allegations of prosecutorial misconduct. In Angel v. Overberg, 682 F.2d 605 (6th Cir.1982) (en banc), this court identified the factors which we are to consider in weighing the extent of prosecutorial misconduct in habeas corpus petitions:
 
 
 30
 In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.
 
 
 31
 Id. at 608 (quoting United States v. Leon, 534 F.2d 667, 679 (6th Cir.1976)). Before weighing the extent of prosecutorial misconduct, however, this court must determine whether any such misconduct exists.
 
 
 32
 Petitioner argues initially that the prosecutor impermissibly attempted to portray him as a bad man. Petitioner specifically complains of numerous questions asked of him on cross-examination with which the prosecutor elicited testimony that petitioner failed to report to his wife, failed to report numerous drug related offenses to the police, and bought stolen clothes and failed to report it to the police. When defense counsel objected to the question whether appellant had reported to the police that Mr. Cavanaugh was selling stolen clothes, the trial court overruled the objection when the prosecutor said the question went to petitioner's character.
 
 
 33
 This was not an abuse of discretion by the trial court. McCormick on Evidence states as follows with respect to the introduction of character evidence to impeach a witness:
 
 
 34
 The familiar practice of impeaching a witness by producing evidence of his bad character for veracity amounts to using a character trait to prove that a witness is testifying falsely. As such, it constitutes a true exception to the policy against using evidence of character solely to show conduct.
 
 
 35
 E. Cleary, McCormick on Evidence Sec. 194 (3d ed. 1984). In the instant case, the prosecution produced evidence of petitioner's bad character for honesty in his dealings with others which could properly be used for impeachment purposes.
 
 
 36
 Petitioner next argues that the prosecutor's argument that defense counsel should have contacted James Sparks, petitioner's brother, if he thought he had something good to say improperly shifted the burden of proof to defendant to call a specific witness for a specific purpose. Following is the relevant portion of the prosecutor's argument:
 
 
 37
 He talks about the brother, Jim Sparks. He says, well, the People would have brought this man in and sandpapered him to the point so he corroborated in detail every single witness.
 
 
 38
 Ladies and Gentlemen of the jury, he says Jim Sparks didn't contact him. If Jim Sparks, the defendant's own brother had something good to say about the defendant, don't you think Mr. Sterling, who did such an outstanding job in this trial, would have made contact with Mr. Sparks, assuming that's the truth?
 
 
 39
 The reason he didn't do that is Jim Sparks came in here and testified, and shot the theory of the defense, along with the other witnesses.
 
 
 40
 This argument was made in response to the following statements by defense counsel:
 
 
 41
 If the assumption is correct, if the defendant is responsible, I'd ask you this, he was on the highways, he was a free man for a period of seven or eight days after the commission of this crime. If he was guilty, and if he was responsible, a fellow by the name of James Sparks would have been the most sandpapered witness you ever heard.
 
 
 42
 Instead of a cluttered story of a drug addict, this man would have given you a story that would befit any brother who was trying to protect a guilty brother.
 
 
 43
 He would have seen the brother's attorney. And he told you, from the witness stand, that he never seen me before. The defendant would have arranged that, the defendant would have seen to it, that that meeting would have taken place.
 
 
 44
 The instant case is distinguishable from United States v. Smith, 500 F.2d 293 (6th Cir.1974), the case cited by petitioner. In Smith, the prosecutor, in arguing for his interpretation of certain intercepted telephone calls which were alleged to contain reference to gambling operation, called upon the defendants to satisfy the jury that there was some other reasonable explanation for the conversations and to show that there were other reasonable alternatives as to what the calls meant. Id. at 294-95. This court found reversible error. We held that the prosecutor's argument violated the spirit, at least, of Griffin v. California, 380 U.S. 609 (1965). Smith, 500 F.2d at 296.
 
 
 45
 In the instant case, the prosecutor's closing argument did not expressly call on defense to prove the non-existence of any element of the offense as the prosecutor did in Smith. However, even if the prosecutor's comment standing alone would have shifted the burden of proof impermissibly to petitioner, this comment was a permissible response to the defense counsel's closing argument. See United States v. Robinson, 108 S.Ct. 864, 869 (1988) (holding that where the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by the defendant or his counsel, there is no violation of the privilege against self-incrimination). Additionally, the trial court instructed the jury that the state had the burden to prove each and every element of the crime charged beyond a reasonable doubt. For these reasons, we reject this argument.
 
 
 46
 Petitioner next argues that the prosecutor's argument interjected the issue of race into the trial and relied on facts not in evidence. The prosecutor made the following argument: "It's alot (sic) easier to put the finger on the other guy, Bob Cleveland, because Bob Cleveland has a record. Bob Cleveland is black. And Bob Cleveland is some kind of person who uses drugs."
 
 
 47
 Although the prosecutor's comment regarding Mr. Cleveland's race was unnecessary, as a factual matter it is hard to believe that it had the effect of interjecting race as an issue in this trial. Moreover, this case is easily distinguishable from Miller v. North Carolina, 583 F.2d 701 (4th Cir.1978), a case cited by petitioner. In Miller, the prosecutor's prejudicial remarks made to an all white jury were critical of the black defendants. The prosecutor repeatedly referred to the defendants as "these black men" and ultimately argued that a defense to rape based on consent was inherently untenable because no white woman would ever consent to having sexual relations with a black. Id. at 704. No such prosecutorial misconduct was present here. Additionally, since Mr. Cleveland was a witness in this case, his race would have been apparent to the jury. For these reasons, we reject this argument.
 
 
 48
 Petitioner next argues that the prosecutor introduced gruesome photographs to inflame the passions of the jury. Petitioner cites to no cases which have held that the introduction of gruesome photographs violates due process. Additionally, the prosecutor made the following statement which indicates that the photographs were not introduced to inflame the passions of the jury:
 
 
 49
 And I'm not showing these pictures to show you that--you know that it's a gruesome deed, and I'm not going to show you these pictures because I want to make you feel mad at the defendant and sorry for the victim. I want to show you these pictures because I believe and I think you will see, when I show them to you, that they throw some light on what happened in this case.
 
 
 50
 Indeed, the prosecutor used these photographs to explain his theory of the case. For example, the prosecutor stated:
 
 
 51
 But I want to show you something else that was found at the autopsy. The wounds where we see where they entered into this coat, underneath the right arm and also caused the top part of the arm to be sliced, to be slashed, when the wounds were inflicted.
 
 
 52
 I'll show it to you, you'll have a chance to look at it again in the juryroom.
 
 
 53
 What does that tell us about the instrument that was used? Do you remember alot (sic) of talk about a double-bladed knife? And who owned such a double-bladed knife at the time this happened? Larry Sparks. He carried it in his glove compartment, according to what he said. Of course, we don't know why he did, but he had a double-bladed knife.
 
 
 54
 And wouldn't the wounds, as made in this picture, be consistent with a knife sharp on both sides, so when you enter into the arm, the upper part of the arm, it would be slashed in such a manner.
 
 
 55
 Thus, the photographs were not introduced merely to inflame the passions of the jury.
 
 
 56
 In United States v. Goseyun, 789 F.2d 1386 (9th Cir.1986) (per curiam), the Ninth Circuit rejected the appellant's argument, made on direct appeal from a conviction for violations of 18 U.S.C. Secs. 1111, 1153 for beating a man to death on an Indian reservation, that the district court erred in admitting into evidence a photograph of the victim's beaten body. The court ruled as follows:
 
 
 57
 Finally, the district court did not err in admitting into evidence the photograph showing the massive injuries to the victim's head. The trial judge's exercise of discretion in balancing the prejudicial effect and probative value of photographic evidence of this type is rarely disturbed. Here where the photograph was relevant evidence of both the cause of death and willful, deliberate, and premeditated nature of the murder, the judge did not abuse his discretion in admitting the evidence.
 
 
 58
 Id. at 1387 (citation omitted). Similarly, we find no error in the trial court's admission of photographs of the victim in the instant case. Accordingly, we reject petitioner's argument.
 
 B.
 
 59
 Petitioner argues that he was denied effective assistance of counsel by the following acts: (1) his counsel's failure to request suppression of his prior misdemeanor conviction; (2) his counsel's failure to object to the conduct of the prosecutor; (3) his counsel's eliciting testimony concerning his prior bad acts; and (4) his counsel's eliciting inadmissible hearsay testimony to the effect that he had admitted killing Ms. Sims.
 
 
 60
 "The Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will raise every conceivable constitutional claim." Isaac, 456 U.S. at 134. Strickland v. Washington, 466 U.S. 668 (1984), established the following two-pronged test for determining whether counsel's representation of a criminal defendant is so deficient as to require reversal of the defendant's conviction:
 
 
 61
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
 
 
 62
 Id. at 687.
 
 
 63
 As this court noted in Blackburn v. Foltz, 828 F.2d 1177 (6th Cir.1987), cert. denied, 108 S.Ct. 1247 (1988),
 
 
 64
 [u]nder the Strickland test, a reviewing court's 'scrutiny of counsel's performance must be highly deferential,' and must strongly presume that counsel's advocacy fell 'within the wide range of reasonable professional assistance.' In evaluating counsel's performance the court should also 'keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.' A reviewing court must not indulge in hindsight but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. Although the district court's findings of fact are subject to the clearly erroneous standard of review, the performance and prejudice components of the Strickland test are mixed questions of law and fact freely reviewable by the appellate court.
 
 
 65
 Id. at 1180-81 (citations omitted).
 
 
 66
 Petitioner argues initially that his attorney's failure to request suppression of his ten-year-old misdemeanor conviction for disorderly conduct constitutes ineffective assistance of counsel. Under Strickland, we must first consider whether defense counsel's performance was deficient. At the time of petitioner's trial, it was within the discretion of the trial court to suppress any conviction if its prejudicial impact outweighed its probative value. See People v. Farrar, 36 Mich.App. 294, 193 N.W.2d 363 (1971). Although in People v. Renno, 392 Mich. 45, 219 N.W.2d 422 (1974), the Supreme Court of Michigan held that further use of municipal ordinance or misdemeanor convictions used by prosecution solely for impeachment purposes was prohibited,[2] Renno was decided two years after petitioner's 1972 trial for murder. Additionally, Renno indicated that it was departing from the current law at that time: "It is time that this Court brings our current interpretation of these statutes back in line with their original purposes." Id. at 55, 219 N.W.2d at 426. Furthermore, a Michigan court of appeals has held that Renno is not to be applied retroactively. People v. Burse, 62 Mich.App. 204, 213, 233 N.W.2d 232, 236 (1975).
 
 
 67
 This court will not find deficiency in petitioner's counsel based on his failure to predict Renno. C.F. Cook v. Foltz, 814 F.2d 1109, 1112 (6th Cir.1987) (counsel had tools to construct Sandstrom-type claim since the issue arose after In re Winship ). Additionally, this case is distinguishable from Blackburn. In Blackburn, defense counsel's recitation of the law to his client regarding admissibility of prior convictions was clearly wrong and could not be said to constitute reasonable trial strategy. Had defense counsel correctly stated the well-established law, Blackburn would have had a meaningful opportunity to decide whether to testify knowing that he could possibly be impeached by only one concealed weapons conviction and not by his other two convictions. This court held that defense counsel's performance was deficient. Id. at 1182.
 
 
 68
 By contrast, there is no evidence that defense counsel in the instant case misstated the law concerning the admissibility of petitioner's prior convictions. It is possible that defense counsel took a gamble that the prior conviction would be ruled admissible under Farrar, and chose to pre-empt prosecution's bringing it up in order to lessen its impact on petitioner's credibility. In light of the deference which this court must give to defense counsel's actions, see Strickland, 466 U.S. at 668, we will not hold petitioner's counsel's actions to be deficient in this respect.[3]
 
 
 69
 Petitioner next argues that his attorney's failure to object to the prosecutor's misconduct constituted ineffective assistance. In Cobb v. Perini, 832 F.2d 342, 347 (6th Cir.1987) (per curiam), this court held that given the strong presumption that under the circumstances, the defense counsel's challenged conduct might be considered sound trial strategy, the habeas petitioner's claim of ineffective assistance of counsel for failure to object to prosecution's testimony about a hallway confrontation between the petitioner and a policeman during trial recess could not be considered deficient. This court noted that defense counsel could have chosen not to object to the testimony for the following three reasons:
 
 
 70
 First, it is not at all clear that any objection that Cobb's attorney might have made would have been sustained and the evidence excluded. Cobb does not offer any basis for exclusion of this testimony. Even assuming that it would have been excluded upon objection, it was reasonable for Cobb's attorney to believe that the evidence was relevant and material, or to have made a strategic decision not to challenge the testimony, thereby focusing undue attention on the matter. Thus, Cobb's attorney's conduct was not demonstrably unreasonable or deficient. Second, Cobb's attorney, by affidavit, suggests (1) that he 'was never made aware of the fact that the defendant had conferred with the police ... until the questions were asked', and (2) '[o]nce the question was out, [he] decided it would do more harm to object than to trivialize it.' This does not show an unsound trial strategy. Finally, counsel's cross-examination of the officer elicited sufficient information to trivialize the matter and to imply that Cobb was not capable of then harming the armed officer whom he had allegedly threatened.
 
 
 71
 Id. at 347-48.
 
 
 72
 The first reason is especially applicable here. In the instant case, we have already reviewed the merits of four out of five of petitioner's allegations of prosecutorial misconduct and found them lacking in merit. Therefore, it is not at all clear that any objection that his attorney might have made would have been sustained. Moreover, it was reasonable for petitioner's attorney to believe that the evidence was relevant and material, or to have made a strategic decision not to challenge the prosecutor's conduct, thereby focusing undue attention on the matter. Thus, petitioner's attorney's conduct with respect to these allegations of prosecutorial misconduct was not demonstrably unreasonable or deficient.
 
 
 73
 The remaining allegation of ineffective assistance of counsel, i.e., failure to object to the prosecutor's argument to the jury that petitioner's presence at trial had given him the opportunity to fabricate his testimony to make it conform to the testimony of the witnesses he heard, is similarly lacking in merit. Although in People v. Smith, 73 Mich.App. 463, 470-71, 252 N.W.2d 488, 492-93 (1977), the Michigan Court of Appeals held that it was inadvisable for the prosecutor to state in closing argument that the defendants' presence in court gave them an opportunity to alter their testimony, the error in Smith was harmless in light of the closing argument taken as a whole. Id. at 471, 252 N.W.2d at 492-93. Smith was the first case in the Michigan appellate courts to exhibit an inclination toward finding error with this type of closing argument, and it was decided five years after petitioner's 1972 trial. We are reluctant to find deficiency in petitioner's counsel based on his failure to predict Smith. We note, however, that this is a closer question than the one involved in failing to predict Renno since the prosecutor's improper argument in this instance infringed on the well established federal constitutional right to be present at trial. Snyder v. Massachusetts, 291 U.S. 97 (1934). Any deficiency in failing to predict Smith, however, was not prejudicial in this case. There was ample evidence to convict petitioner. He has made no showing that his counsel's failure to object to this argument deprived him of a fair trial.
 
 
 74
 Petitioner next argues that defense counsel set the stage for the alleged prosecutorial misconduct of characterizing appellant as a bad man by eliciting testimony that petitioner was a bad man. The only example of such conduct cited by petitioner occurred during examination of Robert Cleveland. The relevant portion of the transcript follows:
 
 
 75
 Q. How long have you known the defendant?
 
 
 76
 A. I'd say for about four years, four or five years.
 
 
 77
 Q. During that time, have you ever known him to be a violent person?
 
 
 78
 A. Pardon?
 
 
 79
 Q. During that period of time, have you ever known him to be a violent person?
 
 
 80
 A. Only things that I've heard, you know.
 
 
 81
 Q. Have you ever seen anything yourself?
 
 
 82
 A. No.
 
 
 83
 Q. Did you fear for the safety and well being of Wilhelmina Sims when the defendant said that he'd like to wring her neck?
 
 A. No, I thought he was just joking.[4]
 
 84
 This example of alleged ineffective assistance of counsel appears to this court to be an attempt to elicit testimony that Robert Cleveland had never seen petitioner in a violent state. Petitioner's counsel did not elicit hearsay concerning things that Robert Cleveland had heard. Additionally, his counsel elicited testimony that Robert Cleveland believed that petitioner was just joking when he said that he would like to wring Ms. Sims' neck. For these reasons, we reject this argument.
 
 
 85
 Petitioner argues that he was denied effective assistance of counsel when his counsel elicited the following testimony from James Vincent concerning a conversation which Robert Cleveland had with petitioner:
 
 
 86
 Q. Did you talk to Robert Cleveland, after the defendant left with your common law wife, Sharon?
 
 
 87
 A. Yes, I did.
 
 
 88
 Q. What did he say to you?
 
 
 89
 A. He said that Larry told him that he had did it.
 
 
 90
 Q. What else did he say?
 
 
 91
 A. The rest of the conversation, I couldn't recall, but the major part of the conversation was to the effect that Larry Sparks had specified that he had killed Mimi.
 
 
 92
 Defense counsel explained the reason he engaged in this general strategy during closing argument. The relevant portions of defense's closing argument follow:
 
 
 93
 During the course of this trial, as a defense counsel, I probably did some things an attorney should not do. I failed to object a number of times and permitted leading questions a number of times. I objected sometimes to a question, and then turned around and asked the same doggone question of the same witness. And I suppose some of you wondered what was going through my mind. Sometimes I wonder myself. But this time, I didn't. What I had in mind was to let you see these people, Craig, Vincent, Cavanaugh, and Cleveland, at their best. Let's give them the ball and see how far they want to run with it. In fact, you recall, I even asked some questions concerning conversation that took place in the absence of the defendant. That's what we call hearsay, a very dangerous question to ask at any time.
 
 
 94
 The object behind the testimony, these people were probably geared up, and prepared as to the activities concerning the defendant, but they would not anticipate questions concerning the activities in the absence of the defendant.
 
 
 95
 And we got some very interesting results on those questions. There are many discrepancies in the testimony of these four people....
 
 
 96
 * * *
 
 
 97
 * * *
 
 
 98
 James Vincent was a witness. You can't help but feel sorry for him. I guess he had a problem. But he indicated to us that yeah he knew this was happening in the hallway, in the bathroom. And I asked him--and this is part of my hearsay question--'after the defendant left with Sharon, what, if anything, did Robert Cleveland say to you?' 'He told me,' in fact, Vincent said that Cleveland said to him, and that's where you get into hearsay, that the defendant had admitted killing Mimi.
 
 
 99
 Ok, we went through a couple more days, and then we had, as a witness, Robert Cleveland. And we put the question to him, 'When did you tell Jimmy Vincent about this terrible thing that happened to Wilhelmina Sims?' He said, 'I don't know. I don't know if it was that morning, or I don't know if it was later that day after I saw Cavanaugh.'
 
 
 100
 But in impeaching him, by referring back to the Preliminary Examination, he agreed that at the Preliminary Examination he said that he didn't tell Jimmy Vincent that morning, but he told Jimmy Vincent after he'd talked to Cavanaugh that afternoon.
 
 
 101
 Those things, you remember. You don't forget those things. That isn't confusion.
 
 
 102
 But, on the other hand, Robert Cleveland did not expect that question to be asked of him. Nor did Jimmy Vincent, nor did they prepare for an answer to that.
 
 
 103
 In light of the deference which this court must give to defense counsel's actions, see Strickland, 466 U.S. at 668, we would be reluctant to hold defense counsel's actions to be deficient in this respect. Furthermore, petitioner cannot show that he was deprived of a fair trial as the result of ineffective assistance of counsel since testimony substantively similar to that elicited of James Vincent was elicited by the prosecutor on direct examination of Robert Cleveland. Although Robert Cleveland testified subsequent to James Vincent, so that it is conceivable that testimony concerning petitioner's statement to Robert Cleveland that he had killed Ms. Sims could have been triggered exclusively by defense counsel's questioning of James Vincent, it is doubtful that the prosecution would have neglected to introduce this relevant statement against interest. For the foregoing reasons, we reject petitioner's arguments.
 
 C.
 
 104
 Petitioner argues that he was denied due process by defense counsel's eliciting, apparently in anticipation of possible impeachment by the prosecutor, that petitioner had been previously convicted of a misdemeanor because he had no counsel in connection with the ten-year-old conviction. Respondent argues that this claim is frivolous on its face because the obvious purpose of this testimony was to enhance petitioner's credibility by not permitting the conviction to be used to show petitioner was hiding something about his background. Like respondent, we believe that petitioner's prior misdemeanor conviction was introduced to enhance his credibility. We do not, however, rely solely upon that belief.
 
 
 105
 In Charles v. Foltz, 741 F.2d 834, 837 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985), this court held that the use of an uncounselled misdemeanor conviction which did not result in imprisonment for impeachment purposes did not violate the petitioner's due process rights. See also Wilson v. Estelle, 625 F.2d 1158, 1159 (5th Cir.1980), cert. denied, 451 U.S. 912 (1981). Alternatively, we held that the district court properly ruled that the use of the uncounselled misdemeanors constituted harmless error. Id. at 838.
 
 
 106
 In the instant case, petitioner submitted an affidavit which indicates only that a fine was imposed in his misdemeanor conviction for disorderly conduct. Therefore, even if we were to assume it was used for impeachment purposes, the admission of petitioner's uncounselled misdemeanor was permissible under Charles.
 
 D.
 
 107
 Finally, petitioner argues that the following jury instruction violated due process:
 
 
 108
 And his testimony is to be scanned and treated the same as that of any other witness. If you find it to be rational, natural and consistent, it may outweigh the testimony of the other witnesses. But, if you find it to be inconsistent with the established facts, then you may treat it the same as you would that of any other witness whose testimony you find to be thus defective.
 
 
 109
 Specifically, appellant argues that by instructing the jury that his testimony had to be "rationale, natural, and consistent" before it could be believed, the trial court's instruction contained the same defects found by the Supreme Court in Cool v. United States, 409 U.S. 100 (1972) (holding that trial court's "accomplice instruction," in effect requiring the testimony to be "true beyond a reasonable doubt" before considering that testimony, impermissibly obstructed the right of a criminal defendant to present exculpatory testimony of an accomplice and unfairly reduced the prosecution's burden of proof).
 
 
 110
 Respondent argues that habeas relief is precluded by petitioner's failure to observe a state procedural rule. Therefore, this court must undertake the analysis set forth in Maupin. First, petitioner failed to object to this jury instruction at trial. Second, although the basis for the state court's decision is unclear, the prosecutor argued procedural default and the merits in the alternative. Therefore, this court may assume that the state court did not rely solely on the merits. Third, petitioner does not argue that procedural default is not an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Fourth, petitioner's argument that ineffective assistance of counsel was the cause for his procedural default is rejected. Similar jury instructions have been upheld by the Michigan courts both before and after petitioner's trial in 1972. See People v. Willett, 105 Mich. 110, 62 N.W. 1115 (1895); People v. Williams, 208 Mich. 586, 175 N.W. 187 (1919); People v. Bonner, 116 Mich.App. 41, 321 N.W.2d 835 (1982). Therefore, the failure of his counsel to object to the instruction did not constitute ineffective assistance of counsel. Finally, as we have stated above, there is no indication that this is an extraordinary case in which a constitutional violation has probably resulted in the conviction of one who is innocent.
 
 
 111
 For the foregoing reasons, the district court's judgment is AFFIRMED.
 
 
 
 [1]
 Petitioner contemporaneously objected to the prosecutor's question whether petitioner had reported to the police the sale of stolen clothes. This objection was overruled by the trial court
 
 
 [2]
 The Michigan Supreme Court noted that even though particular convictions would not be admissible for impeachment purposes, if the factual basis behind these convictions falls within certain circumstances, they may be introduced by the prosecution as substantive evidence. Id. at 56, 219 N.W.2d at 426
 
 
 [3]
 In a footnote, petitioner argues that his attorney's admission into evidence of his uncouncelled misdemeanor also constituted ineffective assistance of counsel because it violated due process. We reject this argument. Petitioner makes his due process argument separately, and it is dealt with more extensively below
 
 
 [4]
 This last response was not included in the joint appendix